# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00577-SCT

*CITY OF STARKVILLE*

*v.*

*4-COUNTY ELECTRIC POWER ASSOCIATION*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/20/2002 |
| TRIAL JUDGE: | HON. ROBERT L. LANCASTER |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARC DARREN AMOS |
| | DEWITT T. HICKS, JR. |
| | WILLIAM DEAN STARK |
| ATTORNEYS FOR APPELLEE: | DAVID L. SANDERS |
| | JEFFREY JOHNSON TURNAGE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 03/24/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE WALLER, P.J., EASLEY AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     The City of Starkville has appealed the Oktibbeha County Chancery Court's entry of a final judgment dismissing its complaint with prejudice.  En route to granting summary judgment in favor of 4-County Electric Power Association, the chancellor ruled, inter alia, that the City's right to purchase the power company's distribution facilities and service rights created under a 1963 Service Area Agreement was non-existent due to the City's failure to seasonably petition the Mississippi Public Service Commission for approval of its contract,

thus rendering the contract unenforceable. Finding the chancellor's dismissal to be consistent with well established law, we affirm.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. In 1934, the Mississippi Legislature passed the Municipally Owned Utilities Act, which gave our states' municipalities autonomous control over the operation and improvement of their individual public utility systems. Accordingly, an era began whereby municipalities were given the exclusive power to either provide electrical service themselves or, in the alternative, designate who would provide the city with service. 1934 Miss. Laws ch. 317 (now codified in Miss. Code Ann. §§ 21-27-11 et seq. (1972)). In utilizing the 1934 utilities act, municipalities routinely extended franchise agreements to third-party providers, thus granting them the use of the streets, alleys and public ground. Miss. Code Ann. § 21-13-3 (1972). Typical of the era, the citizens of the respective municipalities ultimately governed the quality of their own service as ordinances granting franchises were generally required to be approved by a majority of the qualified electors of each municipality. *Id*.

¶3. In furtherance of municipal autonomy, the Mississippi Legislature passed The Municipal Electric Plant Law of 1936 (now codified in Miss. Code Ann. §§ 77-5-401 et seq. (1972)), which authorized municipalities to acquire, operate, and maintain electric plants within or without the corporate limits, without any restriction or limitation of other laws, and to provide electric power and energy to consumers. Importantly, this law conferred upon the municipalities the unique power of eminent domain in order to implement the purposes of the statute. Miss. Code Ann. § 77-5-441 (1972).

¶4. In 1956, the Mississippi Legislature enacted the Public Utilities Act. 1956 Miss. Laws ch. 372, §§ 1-40 (1956), codified in Miss. Code Ann. §§ 77-3-1, et seq. The 1956 Public Utilities Act empowered the Mississippi Public Service Commission ("MPSC") with the exclusive authority to regulate public utilities in designated non-corporate areas. This Act likewise empowered the MPSC with the authority to issue certificates of public convenience and necessity. Additionally, the 1956 Act "grandfathered in" all existing utility service being provided according to the franchise agreements and conferred administrative power to the MPSC over all such future agreements. Also, under the 1956 Act all utilities seeking a franchise, whether corporate or non-corporate, were required to obtain a certificate of public convenience and necessity from the MPSC. However, while the Act created new administrative powers in the MPSC, this power was exclusive of the state's municipalities. In this regard, municipalities expressly retained the power to acquire, purchase, negotiate or condemn the facilities of any utility desiring to serve within their corporate limits. 1956 Miss. Laws ch. 372 § 5(e), codified at § 77-3-17.

¶5. On December 31, 1963, the City of Starkville (Starkville) and 4-County Electric Power Association (4-County) entered into a service area agreement (1963 Agreement). Consistent with the 1956 Public Utilities Act, the 1963 Agreement guaranteed efficient continued utility service to the local polity if Starkville subsequently decided to annex territory which was within 4-County's designated service area. The 1963 Agreement was contingent upon the right of municipalities to annex land which was certificated by the MPSC, and the Agreement provided that if Starkville exercised its right to include territory currently in the 4-County

3

service area via its power of eminent domain, then, in lieu of condemnation proceedings,[1] Starkville could either grant 4-County a no-cost twenty-year franchise to continue operating within the newly annexed area or effectuate an outright purchase of both 4-County's distribution facilities and its service rights. The relevant provisions of the 1963 Agreement stated:

> In the event Municipality at any time or from time to time changes the location of its corporate boundaries in such manner as to enclose within said boundaries an area of service, distribution facilities and/or consumers of Cooperative, Municipality shall, within one-hundred twenty (120) days after annexation becomes effective, elect either to (a) grant Cooperative a franchise without cost to serve all present and future electric consumers within said annexed area for a period of twenty (20) years or (b) buy all of Cooperative's service rights and the associated distribution facilities within the annexed area, with such exceptions as may be agreed upon by the parties. If Municipality elects to buy, it shall be obligated to purchase, and Cooperative shall be obligated to sell to Municipality, said service rights and facilities at a fair value determined as hereinafter provided.

The 1963 Agreement further provided:

> [I]n order to avoid wasteful duplication of facilities and uneconomic service to ultimate consumers, Municipality and Cooperative desire to establish clearly defined arrangements and procedures which will permit continued service to their respective present consumers and the future expansion of Municipality's electric distribution facilities and service in areas which in the future may be included by annexation within its corporate boundaries......

Additionally, both Starkville and 4-County acknowledged the role of the MPSC:

> The parties hereto mutually agree to cooperate in petitioning for and in securing such approval of this agreement by the Mississippi Public Service Commission *as is or may hereafter be required by law*.

---

[1]Under the then-applicable Public Utilities Act of 1956, municipalities could take by condemnation a cooperative's poles, power lines, equipment and rights to distribute electricity within the boundaries of the annexed area.

(Emphasis added).

¶6.    The procedure required by the 1956 Public Utilities Act remained largely intact for over 30 years; however, in 1987 the Mississippi Legislature significantly revised the 1956 Act (1987 Amendments).  The focus of the 1987 Amendments was on three statutes – Miss. Code Ann. §§ 77-3-13, -17, & -21 (Senate Bill 2840, ch. 353).  These 1987 Amendments conferred further administrative authority upon the MPSC, including the power of approval over any determination made concerning the certificated utilities.  While a municipality retained the authority to regulate within its borders, its eminent domain powers were severely curtailed.[2]

¶7.    On November 7, 1994, 4-County provided Starkville with notice that it no longer considered the parties' 1963 Agreement valid.  Specifically, 4-County informed Starkville that pursuant to the Legislature's 1987 Amendments to the 1956 Public Utilities Act, performance under the parties' contract had become impossible.  Two and one-half months later, Starkville, on January 27, 1995, annexed approximately 1.72 miles of 4-County's certificated service area and informed 4-County that, pursuant to the 1963 Agreement, it intended to exercise its option to purchase 4-County's service rights and associated distribution facilities located in the newly annexed area.  When 4-County subsequently refused to voluntarily sell its rights and property in the certificated area, Starkville commenced suit in the Chancery Court of Oktibbeha County via its filing of a complaint for specific performance, declaratory and injunctive relief and damages.    In due course, the chancery court granted 4-County's motion for summary

---

[2]We reviewed the 1987 Amendments in *Cities of Oxford v. N.E. Miss. Elec. Power Ass'n*, 704 So. 2d 59 (Miss. 1997), and determined that their restrictions on a  municipality's power of eminent domain was constitutional.

judgment, and en route to the grant of summary judgment, the chancellor considered the Legislature's 1987 Amendments and reasoned that the amendments rendered the parties' 1963 Agreement unenforceable as it was now unlawful to purchase a certificate of public convenience and necessity without MPSC approval.

¶8.    On January 10, 2002, this Court reversed the chancery court's grant of summary judgment, finding that, notwithstanding the 1987 Amendments, the 1963 Agreement between Starkville and 4-County was valid and enforceable "within the bounds of the regulatory powers of the Public Service Commission." *City of Starkville v. 4-County Elec. Power Ass'n*, 819 So.2d 1216, 1218 (Miss. 2002) (*Starkville I*). We interpreted the 1987 Amendments as not specifically voiding agreements to sell such as the one existing between Starkville and 4-County.  We also stated that "[i]f the legislature wishes to invalidate existing contracts between entities delivering public utilities, it should say so plainly," and we likewise recognized that this determination was directly within the purview of the Legislature as "[t]he Legislature is the foremost expositor of public policy." *Id.* at 1221.

¶9.    Within approximately three weeks after we handed down our decision in *Starkville I*, Representative Tyrone Ellis[3] introduced a bill to amend Miss. Code Ann. § 77-3-13, with the stated purpose being to clarify the legislative intent in passing the 1987 amendments to the

---

[3]Representative Ellis resides in Starkville and represents District 38, comprised of parts of the Counties of Clay, Lowndes, Noxubee and Oktibbeha.

6

1956 Public Utilities Act. House Bill 997 was passed on March 4, 2002 (2002 Miss. Laws, ch. 303, §§ 1-2 (2002 Amendments).[4]

¶10. Upon remand to the chancery court, 4-County, not surprisingly, again filed a motion for summary judgment, this time undergirding its motion with the Legislature's 2002 Amendments. In its motion, 4-County asserted inter alia that Starkville failed to comply with the 2002 Amendments and neither petitioned the MPSC nor demonstrated 4-County's failure to render "reasonably adequate service" to its members in the certificated areas. *See* Miss. Code Ann. § 77-3-21. Starkville responded by inter alia challenging the constitutionality of the new legislation and seeking a transfer of the case to the Circuit Court of Oktibbeha County for a jury trial in order to determine compensatory as well as punitive damages due to 4-County's intentional breach of the parties' 1963 Agreement.[5]

¶11. On September 23, 2002, the chancellor denied Starkville's motion to transfer to circuit court and granted partial summary judgment in favor of 4-County. *See* Miss. R. Civ. P. 56 (d). En route to its grant of partial summary judgment, the chancellor analyzed and followed our

---

[4]The full title of House Bill 997 was "AN ACT TO AMEND SECTION 77-3-13, MISSISSIPPI CODE OF 1972, TO CLARIFY THAT MUNICIPAL UTILITIES ARE NOT REQUIRED TO OBTAIN A CERTIFICATE OF CONVENIENCE AND NECESSITY FOR OPERATING WITHIN ONE MILE OF THE CORPORATE LIMITS AND THAT MUNICIPAL UTILITIES MAY NOT OPERATE IN AREAS CERTIFICATED TO ANOTHER UTILITY, AND TO CLARIFY THE PROCEDURE FOR THE ACQUISITION OF CERTAIN UTILITY PROPERTY WITHIN MUNICIPALLY ANNEXED AREAS; AND FOR RELATED PURPOSES." This act took effect from and after its date of passage, which was March 4, 2002. It is interesting to note that this was only four days after our denial of 4-County's motion for rehearing in *Starkville I*.

[5]As will be discussed later in this opinion, in challenging the constitutionality of H. B. 997, Starkville failed to give proper notice to the Attorney General of the State of Mississippi. *See* Miss. R. Civ. P. 24(d).

decision in *Starkville I* as well as H. B. 997, and found that the 1963 Agreement could only be enforceable if approved by the MPSC pursuant to the 1987 Amendments as clarified by H. B. 997. The chancellor on the same day entered his partial summary judgment consistent with his opinion, which partial summary judgment stated in part:

> It is ordered and adjudged that [4-County] is awarded a partial summary judgment against [Starkville] declaring the parties' written agreement of December 31, 1963, is unenforceable unless the Public Service Commission shall approve the sale under said agreement of that portion of [4-County's] rights and properties located within the portion of [Starkville] which was annexed into the said municipality in 1994. It is further ordered and adjudged that this cause be and it is hereby stayed until the parties have received a ruling by the Public Service Commission on the validity of the proposed sale under the said agreement.

Instead of heeding the chancellor's order, Starkville chose to file with the chancery court a motion for certification for an interlocutory appeal to this Court. On October 22, 2002, the chancellor denied M.R.A.P. 5 certification for an interlocutory appeal, and by order dated January 15, 2003 and filed with the Oktibbeha County Chancery Clerk on January 22, 2003, a three-justice panel of this Court denied Starkville's petition for an interlocutory appeal.

¶12. Seventy days after receiving notice of this Court's denial of its request for an interlocutory appeal; 191 days after the chancellor's grant of partial summary judgment; and, instead of heeding the chancellor's directive and petitioning the MPSC for approval of the sale of the 1994 annexed area under the 1963 Agreement, Starkville chose instead to file with the chancery court a motion for the chancellor to reconsider his September 23, 2002, order granting partial summary judgment. On May 20, 2003, the chancellor by order denied Starkville's motion to reconsider.

8

¶13. On August 7, 2003, the chancery court sua sponte entered an order converting the partial summary judgment into a final summary judgment inasmuch as Starkville, after the lapse of a reasonable amount of time, failed to petition the MPSC for approval of the sale of the 1994 annexed area consistent with the provisions of the 1963 Agreement. Starkville's appeal to this Court followed.

¶14. Both parties set out the appropriate assignments of error using different phraseology and address these assignments of error in different order. However, we will restate and reorder these assignments of error for the sake of clarity.

## DISCUSSION

### I. WHETHER THE CHANCERY COURT ERRED IN FAILING TO TRANSFER THIS CASE TO THE CIRCUIT COURT OF OKTIBBEHA COUNTY, MISSISSIPPI.

¶15. The cases are legion where we have stated that the issue of jurisdiction is a question of law which we must review applying a de novo standard. *Trustmark Nat'l Bank v. Johnson*, 865 So.2d 1148, 1150 (Miss. 2004) (citing *Briggs & Stratton Corp. v. Smith*, 854 So.2d 1045, 1048 (Miss. 2003); *Rogers v. Eaves*, 812 So.2d 208, 211 (Miss. 2002)).

¶16. Starkville asserts that this suit has now become basically a breach of contract suit wherein Starkville seeks to recover compensatory and punitive damages from 4-County for its failure to comply with the terms of the 1963 Agreement. In addressing this issue, we look first to Starkville's Complaint for Specific Performance, Declaratory and Injunctive Relief, and Damages, which Starkville itself chose to file in chancery court (not circuit court), on April 7, 1995, thus commencing this protracted litigation. The prayer contained in this complaint

9

sought relief via the chancery court's (1) declaring that the 1963 Agreement was valid and enforceable as between the parties; (2) ordering that 4-County specifically perform its obligations under the 1963 Agreement by way of a good faith negotiation with Starkville for its purchase of 4-County's distribution and service rights within the newly annexed area; (3) issuing a temporary and permanent injunction thus enjoining 4-County from extending its distribution facilities in the newly annexed area; (4) finding that 4-County willfully and wrongfully breached the 1963 Agreement (thus entitling Starkville to a recovery of actual and punitive damages); and, (5) awarding "such other general and special relief as may be proper in the premises."

¶17.    In its order denying Starkville's motion to transfer this case to circuit court, the chancellor stated that "[s]ubject matter jurisdiction is determined from the allegations of the complaint.    The complaint seeks specific performance of a contract which is an equitable remedy....."

¶18.    In *Trustmark*, we held that the circuit court erred in denying a motion to transfer to chancery court.  In so doing, we readily acknowledged that most of our recently decided cases on the issue of transfer involved the question of whether a case commenced in chancery court should have been transferred to circuit court.  865 So.2d at 1152 (citing *Briggs & Stratton Corp*.; *City of Ridgeland v. Fowler*, 846 So.2d 210 (Miss. 2003); *United States Fid. & Guar. Co. v. Estate of Francis*, 825 So.2d 38 (Miss. 2002)).  We noted in *Trustmark* that the circuit court complaint, while asserting claims of negligence, breach of contract, breach of fiduciary

10

duty and gross negligence, actually focused on the administration of a trust which had been under "the exclusive jurisdiction of the [chancery court] and has been since its inception." ***Id.*** at 1151. We likewise stated in ***Trustmark***:

> The Plaintiffs counter that they seek legal action rather than equitable remedies and that subject matter jurisdiction is proper in the circuit court; however, the Plaintiffs concede that when determining the true nature of the claim, one must look at the substance, and not the form, of the claim in order to determine whether the claim is legal or equitable.[6] ***Briggs & Stratton Corp. v. Smith***, 854 So.2d at 1049; ***Tillotson v. Anders***, 551 So.2d 212, 214 (Miss. 1989); ***Thompson v. First Miss. Nat'l Bank***, 427 So.2d 973, 976 (Miss. 1983); ***Dixie Nat'l Life Ins. Co. v. Allison***, 372 So.2d 1081, 1085 (Miss. 1979). As Trustmark correctly asserts, "[a]lthough, the Plaintiffs employ the language of negligence and legal remedy, the fundamental substance of their claim is testamentary and equitable."

865 So.2d at 1151.

¶19. When we review Starkville's complaint in today's case, we can state with confidence that the relief sought on specific performance of a contract is typically the type of relief to be considered by our chancellors sitting as a court of equity. Additionally, Starkville presumably made a knowing and conscious decision to commence this litigation in chancery court (as opposed to circuit court) when it filed its complaint in 1995. This case has been litigated in chancery court, appealed to this Court, and relitigated in chancery court. As we stated in ***Rogers***, because the chancery court had already heard extensive litigation in the case, it was certainly in the best position to hear and resolve the relevant issues in the related case which had been commenced. 812 So.2d at 211-12. In fact, in today's case, the same chancellor has

---

[6]This is exactly what the chancellor in today's case did in addressing the jurisdictional issue when he stated that the issue had to be resolved by reviewing "the allegations of the complaint."

11

been involved with the litigation of this case since its inception in 1995. Who was in a better position to fairly and correctly decide the issues in this case than the learned chancellor who had presided over all the proceedings in this case from the very beginning? *Trustmark*, 865 So.2d at 1151.

¶20. Thus, for the reasons stated, we find that the chancellor quite appropriately denied Starkville's motion to transfer this case to the Circuit Court of Oktibbeha County. Inasmuch as we have determined that the Chancery Court of Oktibbeha County had jurisdiction to hear and decide this case, we now turn to the remaining issues.

## II. WHETHER THE CHANCERY COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF 4-COUNTY.

¶21. Just as in considering the issue of jurisdiction, our standard of review in considering a trial court's grant of summary judgment is de novo. *Miller v. Meeks*, 762 So.2d 302, 304 (Miss. 2000) (citing *Short v. Columbus Rubber & Gasket Co.*, 535 So.2d 61, 63 (Miss. 1988)). Accordingly, this Court must employ a factual review tantamount to that of the trial court when considering evidentiary matters in the record. *Aetna Cas. & Sur. Co. v. Berry*, 669 So.2d 56, 70 (Miss. 1996). By design, the grant of summary judgment is governed by a high standard and requires that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c).

12

¶22. In claiming error in the chancellor's grant of 4-County's motion for summary judgment, Starkville raises several additional errors committed by the chancellor en route to his grant of summary judgment. We will separately discuss these assertions of error.

### A. Whether the chancellor erred in finding that Starkville lacked standing to challenge the constitutionality of House Bill 997.

¶23. On the issue of Starkville's standing to attack the constitutionality of H. B. 997, the chancellor, in his opinion granting partial summary judgment, stated:

> The City of Starkville is a political subdivision of the State. It is created by the State and exists through the action of the State. All rights and powers possessed by the City are at the discretion of the State by grant of statute. Therefore as held in the Oxford case, a city cannot attack the constitutionality of State legislation on grounds that its own rights have been impaired. [Starkville] has no standing to raise an issue of unconstitutionality of the immediate statute. The statute is presumed constitutional and can only be declared unconstitutional if shown to be so beyond a reasonable doubt. As this lack of standing by [Starkville] disposes of its challenge to H. B. 997, the constitutionality of the statute need not be reached.

¶24. The "Oxford case" to which the chancellor referred in his opinion is our decision in *Cities of Oxford v. N. E. Miss. Elec. Power Ass'n*, 704 So.2d 59 (Miss. 1997). In *Oxford*, twelve municipalities commenced a declaratory judgment action in circuit court seeking to have the 1987 Amendments declared unconstitutional. *Id.* at 61. The municipalities in *Oxford* conceded the right of the Legislature to take away the municipalities' eminent domain power, but asserted that the 1987 Amendments unconstitutionally placed in the hands of private corporations (i.e., power companies) "the ability to prevent [the municipalities'] exercise of the power of eminent domain." *Id.* at 66. In affirming the circuit court's grant of summary judgment in favor of the utilities and against the municipalities, we stated:

13

The municipalities have no inherent power or right of eminent domain. The municipalities have asserted that the defendant-utilities have some sort of "veto" power over the municipalities' eminent domain power. The 1987 Amendments provide a procedure which the municipalities must follow before condemning the land service areas and facilities of the defendant-utilities. Surely the Legislature which may grant or deny the power of eminent domain to a municipality may also establish a procedure or method by which it may be void.

*Id.* at 67.

¶25. However, with all deference to the chancellor and the parties in the case sub judice, the issue here is not one of standing (just as it was not the issue in *Oxford*). If it were, then as correctly asserted in its brief, Starkville would prevail on the standing issue. In *City of Belmont v. Miss. State Tax Comm'n*, 860 So.2d 289 (Miss. 2003), twenty municipalities commenced a declaratory judgment action against the Mississippi State Tax Commission (MSTC), in an effort to have the MSTC judicially mandated to divert state sales tax funds to the municipalities. *Id.* at 291-92. In *Belmont*, relying on our decision in *Harrison County v. City of Gulfport*, 557 So.2d 780 (Miss. 1990), we set out our general rule on standing:

> Parties may sue or intervene where they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, *see Dye v. State ex rel. Hale*, 507 So.2d 332, 338 (Miss. 1987); *Frazier v. State of Mississippi*, 504 So.2d 675, 691-92 (Miss. 1987); *Belhaven Improvement Association, Inc. v. City of Jackson*, 507 So.2d 41, 45-47 (Miss. 1987), or as otherwise authorized by law, *see, e.g.*, *Canton Farm Equipment v. Richardson*, 501 So.2d 1098, 1105-09 (Miss. 1987); *City of Pascagoula v. Scheffler*, 487 So.2d 196, 198 (Miss. 1986).

*Harrison County v. City of Gulfport*, 557 So.2d 780, 782 (Miss. 1990).

\*\*\*\*\*\*\*\*\*\*\*\*

14

> Because the Municipalities have a colorable interest in the subject matter of this litigation, we find the trial court erred in dismissing this suit on the grounds that the Municipalities lacked standing.

860 So.2d at 296-97.

¶26. Clearly, Starkville had standing to challenge the constitutionality of H. B. 997, in that Starkville (1) had a colorable interest in the subject matter of the litigation and (2) experienced an adverse effect from the conduct of 4-County. Thus we find the chancellor erred in his finding that Starkville lacked standing to challenge the constitutionality of H. B. 997; however, such finding of error hardly ends the inquiry.

¶27. Notwithstanding a finding of Starkville's lack of standing to challenge H. B. 997, the chancellor still proceeded to address the bill's constitutionality. The record clearly reveals that Starkville was not in any way hampered in fully presenting its case before the chancellor because of the chancellor's finding of lack of standing. Thus, the chancellor's error in this regard is harmless beyond any doubt. *See **Guar. Nat'l Ins. Co. v. Pittman***, 501 So.2d 377, 386 (Miss. 1987).

> **B.      Whether the chancellor erred in finding that performance under the parties' 1963 service area agreement requires specific approval from the Mississippi Public Service Commission in accord with the Legislature's 1987 and 2002 Amendments.**

¶28. At the heart of this ongoing litigation is the effect that the 1987 and 2002 Amendments has on the parties' ability to legally perform under their 1963 service area agreement. In 2002, this same question was before this Court, and we concluded that the parties' contract was valid and enforceable within the bounds of the regulatory powers conferred upon the MPSC.

15

*Starkville I*, 819 So.2d at 1218. In so holding, we invited the Legislature to act. "If the Legislature wishes to invalidate existing contracts between entities delivering public utilities, it should say so plainly" inasmuch as "[t]he Legislature is the foremost expositor of public policy." *Id*. at 1221. Opting not to affirm the chancellor's grant of summary judgment and dismiss this litigation, we remanded the case back to the chancery court stating, "[i]f public policy now dictates that these contracts be voided, it is for the Legislature, not this Court, to say so." *Id*. In short order, the Mississippi Legislature responded to our invitation and within days of our decision in *Starkville I* passed H. B. 997. We quote below from Miss. Code Ann. § 77-3-13(3), with the strikeouts and underline indicating the revisions to the last two sentences of subsection (3) based on the passage of H. B. 997:

> ~~Provided,~~ However, nothing in this section shall be construed as requiring such certificate for a municipally owned plant, project or development, route, line or system or extension thereof in areas <u>within one (1) mile of the corporate boundaries which are</u> not certificated to another utility<u>, and nothing in this chapter or other provision of law shall be construed as allowing a municipally owned plant, project or development, route, line or system or extension thereof in areas certificated to another utility.</u> ~~Provided, further,~~ <u>N</u>o certificate shall be required for extensions or additions within the corporate limits of a municipality being served by the holder of a certificate of convenience and necessity.[7]

The main revisions to Miss. Code Ann. § 77-3-13 resulted in the addition of a new paragraph. Thus, pursuant to H. B. 997, the then-existing subsection (7) became subsection (8), and the new subsection (7) provided:

---

[7]The underlined language represents the language added to Miss. Code Ann. § 77-3-13(3) by H.B. 997.

16

(7) Before the acquisition pursuant to any negotiated purchase agreement entered into before 1987, by any public agency, authority, district, state or other agency, institution or political subdivision thereof, of any certificate of public convenience and necessity or portion thereof, service areas or portion thereof, or operating rights or portion thereof, issued or granted by the commission pursuant to this section and/or the facilities or other properties and equipment of the utility providing service therein of any regulated utility defined in Section 77-3-3(d)(I), the commission first shall determine that such service area, certificate of public convenience and necessity, or operating right, or portions thereof, shall be cancelled as provided in Section 77-3-21.

Miss. Code Ann. § 77-3-13(7); Laws, 2002, ch. 303, § 1, eff. from and after passage (approved Mar. 4, 2002).

¶29. Based on this new statutory guidance, we now revisit the parties' 1963 Agreement and evaluate the effect that current procedural requirements, originally promulgated in 1987 and clarified in 2002, have on the parties ability to perform their contract.

¶30. From their inception, public utilities have garnered much attention from our state government. Accordingly, their important function places utility companies squarely in the public eye and intermittently subject to legislative prerogative. It is no doubt important for legislators to insure adequate service to their constituents and therefore important that they stay abreast of the activities of their constituents' utility providers. In 1987, the Legislature decided to reassess the procedure by which it guaranteed reasonably adequate service to our citizenry, and accordingly, amended Miss. Code Ann. §§ 77-3-13, -17 & 21, by passing Senate Bill No. 2840, Laws, 1987, ch. 353, § 1.

¶31. With the passage of the 1987 Amendments, the Legislature sought to assure continued adequacy of utility services to the citizens of this state, and in particular to the customers and

17

consumers of regulated public utilities. To do this, the Legislature conferred plenary authority upon the MPSC over the inhabitants and consumers of those service areas which had been included in certificates of public convenience and necessity and over the operating rights granted therein. *Id.* In amending Section 77-3-13, the 1987 Legislature added paragraph (6):

> (6) Prior to acquisition pursuant to Section 77-3-17, Mississippi Code of 1972, or other provisions of law, by any public agency, authority, district, state or other agency, institution or political subdivision thereof, of any certificate of public convenience and necessity or portion thereof, service areas or portion thereof, or operating rights or portion thereof, issued or granted by the commission pursuant to the provisions of this Section 77-3-13 and/or the facilities or other properties and equipment of the utility providing service therein; of any regulated utility as defined in Section 73-3-3(d)(i),(ii) and (iii), Mississippi Code of 1972, the commission shall first determine if such service area, certificate of public convenience and necessity or operating right, or portions thereof, should be cancelled as provided in Section 77-3-21, Mississippi Code of 1972.

Miss. Code Ann. § 77-3-13 (1972) (see also Senate Bill No. 2840, 1987 Miss. Laws ch. 353, § 1).

¶32.     Section 77-3-21 provides for adequacy hearings and when read in pari materia with Section 77-3-17, works to curtail a municipalities' ability to exercise eminent domain over public utilities holding certificates of public convenience and necessity. Additionally, Section 77-3-21 provides in pertinent part:

> Prior to any municipality exercising the power of eminent domain as provided in Section 77-3-17, the commission shall determine that the certificate of public convenience and necessity granted to the utility pursuant to Section 77-3-13 for the service area wherein such facilities are located, shall be cancelled as provided in this section.

Miss. Code Ann. § 77-3-21 (1972) (see also S. B. No. 2840, 1987 Miss. Laws ch. 353, § 1).

18

¶33. The first paragraph of section 77-3-21 expressly sets out the procedure by which a certificate of public convenience and necessity is cancelled:

> The commission may, after hearing had upon due notice, make such findings as may be supported by proof as to whether any utility holding a certificate under the provisions of this article is rendering reasonably adequate service in any area covered by such utility's certificate. In the event the commission finds that such utility is not rendering reasonably adequate service the commission may enter an order specifying in what particulars such utility has failed to render reasonably adequate service and order that such failure be corrected within a reasonable time, such time to be fixed in such order. If the utility so ordered to correct such a failure fails to comply with such order of the commission and the commission finds that cancellation of its certificate would be in the best interest of the consuming public served by the holder of the certificate, its certificate for the area affected may be revoked and cancelled by the commission.

Miss. Code Ann. § 77-3-21 (1972).

¶34. It appears that the 1987 Amendments were initiated by the Legislature not only to reform prevailing procedures which had either been reinforced by or implemented under the 1956 Public Utilities Act, but also to streamline diverse authority into a single administrative body which could ultimately guarantee "reasonably adequate service" to consumers in certificated areas. Accordingly, the amendments consolidated the authority and power formerly instituted in the plurality of the state's municipalities and conferred such authority directly upon the MPSC. We first acknowledged the impact of the 1987 Amendments in *City of Clarksdale v. Miss. Power & Light Co.,* 556 So. 2d 1056 (Miss. 1990), where we stated that "prior to a municipality exercising the power of eminent domain against a utility the certificate of public convenience and necessity held by the utility had to be cancelled by the [MPSC]." *Id*. at 1057. In *Oxford*, we again considered the amendments and stated, "[t]he 1987

19

Amendments provide a procedure which the municipalities must follow before condemning the land service areas and facilities of the defendant-utilities." 704 So.2d at 67. "[P]rior to any condemnation as provided for under the Miss. Code Ann. § 77-3-17, the [M]PSC must first determine that the certificated utility is not providing reasonably adequate service in the area in question and that the utility's certificate of public convenience and necessity should be canceled as provided in Miss. Code Ann. Section 77-3-21." *Id*. at 64. The implicit intent of the 1987 Amendments was to provide infrastructure and centralize the authority regulating properly certificated utility providers and to obviate ad hoc agreements predicated on a municipalities' perceived unfettered right of condemnation and eminent domain. To this end, we can safely conclude that the 1987 Amendments were enacted in an attempt to assure efficient, economic and uninterrupted service to this state's consuming public. In 2002, we recognized this and noted:

> For many years, eminent domain in these premises, unfettered by any reference to the Public Service Commission, was in fact the public policy. This contract and perhaps others were entered into during that period. If public policy now dictates that these contracts be voided, it is for the Legislature, not this Court, to say so.

*Starkville I*, 819 So. 2d at 1221. Today, we recognize that the Legislature has clearly stated that it is no longer this State's public policy for our municipalities to have unfettered eminent domain power and that municipalities thus can no longer lay claim to land in a certificated area and condemn certificated providers' facilities and equipment, without express approval of the MPSC.

20

¶35. While municipalities enjoyed unfettered use of their eminent domain power for over thirty years, it eventually became the Legislature's clear intent to relieve our municipalities of such power and authority. In 2002, our Legislature explicitly clarified its intent and purpose for enacting the 1987 Amendments via its passage of H. B. 997. With its most recent action, it has become abundantly clear that the Mississippi Legislature has unbound the hands of certificated service providers and thwarted the effect of leveraged service agreements formed prior to the 1987 legislation.

¶36. In this case, Starkville is attempting to effectuate its last opportunity to exercise its formerly conferred power of eminent domain. Starkville desires to legally avoid the all-inclusive statutory effect of the Legislature's 1987 Amendments by relying on its 1963 Agreement with 4-County. In essence, Starkville is demanding justice based entirely on a snapshot of a public utility service law which was passed almost a half-century ago. In granting partial summary judgment, the chancellor correctly interpreted and applied H. B. 997 as expressly clarifying the intended legislative interpretation to be given to the 1987 Amendments to Sections 77-3-13, -17 & -21. The chancellor stated in his opinion:

> The pre-1987 agreements to purchase cannot be enforced unless the subject certificate held by the vendor-utility shall first be cancelled under Section 77-3-21. This is a statutory condition of approval of any sale under a pre-1987 agreement of purchase and binds both the Public Service Commission [MPSC] and any parties to a pre-1987 contract of purchase.

In concluding that the parties were ultimately subject to the authority of the MPSC, the chancellor cited important contractual language from the parties' 1963 Agreement whereby

21

both parties mutually agreed to cooperate in petitioning for, and securing the approval of the MPSC "as is or may hereafter be required by law."

¶37.    Consistent with our decision in *Starkville I*, the chancellor found that the parties clearly understood that the subject matter of their agreement was one regulated by the State and subject to continued regulation by our Legislature.    Accordingly, the chancery court determined that the 2002 Amendments, which rendered the contract unenforceable unless approved by the MPSC, was contemplated by the parties by the express provisions of their 1963 Agreement binding them to future legislative enactments. The chancellor thus quite appropriately granted partial summary judgment pending Starkville's petition to the MPSC for approval of its proposed purchase of 4-County's service rights and associated distribution facilities within the annexed area in accordance with the 1963 Agreement.

¶38.    The 1963 Agreement between Starkville and 4-County was predicated on the free reign of a municipality to exercise its power of eminent domain in order to assure its citizens of "reasonably adequate service"from its utility provider.    In 1987, our Legislature expressly revised this procedure and divested the municipalities of this unfettered right.    Accordingly, the Legislature vested the MPSC with plenary authority and jurisdiction over the regulation of the state's public utility services in certificated areas.    The entire scope of the parties' 1963 Agreement now falls squarely within the province of the MPSC, and while the parties in contracting took note of the MPSC, even had they not, the clear mandate issued by the Legislature in acting for the public interest places the subject matter of the service agreement well within the powers the Legislature has conferred upon the MPSC.

¶39.    With the passage of H. B. 997, the Legislature has expressly and inextricably bound pre-1987 municipal-certificated service provider contracts to direct MPSC governance.   In consideration of this specific legislative directive and in the absence of the MPSC's express approval, it is abundantly clear that the 1963 Agreement can no longer be performed. Moreover, the Legislature through amendments to Miss. Code Ann. §§ 77-3-13, -21, has obviated Starkville's ability to exercise its rights under its 1963 Agreement, inasmuch as Starkville failed to petition the MPSC for approval of its contract of sale within a reasonable time after the chancellor's grant of partial summary judgment.

¶40.    For the reasons stated, we conclude that the chancellor did not err in finding that performance under the 1963 Agreement required the approval of the MPSC based on the 1987 and 2002 legislative amendments.

### C.    Whether the chancellor erred by retroactively applying House Bill 997 passed by the Mississippi Legislature in 2002.

¶41.    This issue is obviously closely akin to the issue just discussed.   Starkville argues that Mississippi law prohibits the retroactive application of a statute absent the Legislature's clear intent to do so.   We agree.   It is well-settled in our jurisprudence that statutes be interpreted prospectively, and where they are not, there must be a clear indication from the Legislature that they be applied retrospectively as well. *City of Belmont v. Miss. State Tax Comm'n*, 860 So. 2d at 302 (citing *Mladinich v. Kohn*, 186 So. 2d 481, 483 (Miss. 1966)).   A statute will not be given retroactive effect unless it is manifest from the language that the Legislature intended it to so operate. *Mladinich*, 186 So. 2d at 483.

¶42. As is abundantly clear by now, in 2002, the Legislature passed H. B. 997 within weeks after we handed down *Starkville I* and explicitly stated what had been implicit in the 1987 Amendments to the Public Utilities Act of 1956. Accordingly, the Legislature added definitive language to Miss. Code Ann. § 77-3-13 which expressly states that all contracts entered into prior to 1987 are subject to the approval of the MPSC. "Before the acquisition pursuant to any negotiated purchase agreement entered into before 1987...[t]he commission first shall determine that such service area, certificate of public convenience and necessity, or operating right, or portion thereof, shall be cancelled as provided in Section 77-3-21." Miss. Code Ann. § 77-3-13(7) (Supp. 2002). By its very terms as stated above, H. B. 997 reveals a clear legislative intent to have the 1987 Amendments apply retrospectively. It is certainly hard to imagine a more manifest indication of legislative intent than the language used in House Bill 997 and codified as subsection (7) in Miss. Code Ann. § 77-3-13, especially when coupled with the blinding speed in which the Legislature reacted to our decision in *Starkville I*.

¶43. While the clear intent of the Legislature was to have H. B. 997 apply directly to this case, inasmuch as we invited the Legislature to do so, this Court has also affirmed cases involving the retroactive application of statutory amendments to pending litigation. In evaluating retroactive legislation in *Belmont,* we cited precedent as supporting "the retroactive application of legislation, even when the legislation would abate litigation pending prior to the legislation becoming adopted." 860 So. 2d at 303-04 (*see USPCI of Miss., Inc. v. State ex rel.*

24

*McGowan*, 688 So. 2d 783, 786-87 (Miss. 1997); *City of Clarksdale v. Miss. Power & Light Co.,* 556 So. 2d 1056 (Miss. 1990)).

¶44. In *Belmont*, municipalities brought an action against the Mississippi State Tax Commission in November of 1999, seeking declaratory, as well as injunctive relief, so as to force the MSTC to comply with state law concerning the diversion of state sales tax to municipalities. 860 So.2d at 292. Four months later, in March of 2000, the Legislature passed House Bill 987, and using definitive language endorsed the method employed by the MSTC for calculating payments due all municipalities. *Id*. at 293. After the circuit court's dismissal pursuant to Miss. R. Civ. P. 12(b)(6), the municipalities appealed to this Court. In affirming the circuit court's dismissal, we held inter alia that this Court had previously allowed the retroactive application of statutes, amendments and rules, citing *Burrell v. Miss. State Tax Comm'n*, 536 So. 2d 848 (Miss. 1988). "[L]egislative enactment of House Bill No. 388 was so integrally related to the adoption of House Concurrent Resolution 41, so that the latter, once ratified, ought be taken as breathing legal life into the former. 536 So.2d at 860." *Belmont*, 860 So.2d at 302.

¶45. We addressed the very same amendments at issue in this case in *Clarksdale* and found them determinative of pending litigation. In *Clarksdale*, the city filed an eminent domain action on March 5, 1987, in order to condemn the facilities of a certificated electrical utility. 556 So.2d at 1057. Twelve days later, on March 17, 1987, the Mississippi Legislature adopted the 1987 Amendments. *Id.* As stated previously, the 1987 Amendments severely curtailed a

25

municipality's ability to exercise its power of eminent domain and specifically required, "that prior to a municipality exercising the power of eminent domain against a utility the certificate of public convenience and necessity held by the utility had to be cancelled by the [MPSC]." *Id.* "The trial judge held that because the City's right of eminent domain was a creation of statute, under well-settled law any amendment to a statute was treated as though it had been a part of the original statute." *Id*. Since the MPSC had not acted on the utility's certificate of public convenience and necessity, the trial judge ultimately dismissed the City's petition In affirming the trial judge's retroactive application of the 1987 amendments, we referred to precedent:

> In *Oliphant v. The Carthage Bank*, 224 Miss. 386, 80 So.2d 63, 72 (1955), we held:
>> It is well-settled by the decisions of our Court, and in most every other jurisdiction, that when proceedings are in process under a statute and have not been completed, and have not reached the stage of final judgment, and a new act is passed, modifying the statute under which the proceedings were begun, the new statute becomes integrated into and a part of the old statute as fully as if written therein from the very time the old statute was enacted.
>
> 224 Miss. at 410, 80 So. 2d at 72.

556 So. 2d at 1057.

¶46.    In *USPCI*, a county resident filed suit charging the Governor did not follow proper procedures in connection with the proposed construction of a hazardous waste treatment facility.   688 So.2d at 785.   While the suit was pending, the Legislature amended Miss. Code Ann. § 23-43-5 to specifically exclude the Governor from these requirements.   In reversing the circuit court's order which directed the Governor to comply with the Administrative Procedures Law in adopting a capacity assurance plan for the construction of a hazardous waste

26

treatment facility, we stated: "An amended act is ordinarily construed as if the original statute had been repealed, and as far as any action after the adoption of the amendment is concerned, as if the statute had been originally enacted in its amended form." *Id*. at 786-87 (citing ***Beatty v. State***, 627 So.2d 355, 357 (Miss. 1983); ***Stone v. Independent Linen Serv. Co.***, 212 Miss. 580, 55 So.2d 165 (1951); ***McMullen v. Sinclair Ref. Co.***, 207 Miss. 71, 41 So.2d 382 (1949)). We concluded in ***USPCI***:

> "When cases are in the bosom of this Court and there is involved a statute that is modified prior to a final decision of this Court, we take that modification into consideration." ***Bell v. Mitchell***, 592 So.2d 528 (Miss. 1991), citing ***Parker v. Bailey***, 437 So. 2d 33 (Miss. 1983).

688 So.2d at 787.

¶47. As we have stated in this case and prior cases, we are keenly aware of our responsibility regarding judicial review of legislative action. We indeed should be about the business of interpreting legislative enactments while avoiding judicial legislating. This should be apparent from our decision in ***Starkville I***. With that in mind, we are again guided by our decision in ***Belmont***:

> For those who might experience some consternation over whether today's decision somehow erodes the independence of the judicial branch of state government, it should be remembered that municipalities are but creatures of the state and they possess only such power as conferred upon them by statute.....This concept should hardly be a shock to anyone.

860 So.2d at 306.

¶48. Today, there is not only clear legislative intent that H.B. 997 should indeed apply to this instant litigation, there is also clear precedent indicating that, if the Legislature chooses to

27

amend a statute while a case is still pending, we will apply that amendment as if it had been part of the statute all along. H. B. 997 was styled "Act to Clarify the Procedure for Acquisition of Certain Utility Property within Municipally Annexed Areas." In no uncertain terms the 2002 Act makes explicit that which had been implicit in the 1987 Amendments, and the procedure enacted under Miss. Code Ann. § 77-3-13 should unquestionably be read as if subsection (7) had been a part of the statute all along.

¶49. We thus find for the reasons stated that the chancellor was indeed eminently correct in retroactively applying House Bill 997 to this pending litigation.

> **D. Whether the chancellor in failing to find that H. B. 997 violates the Contracts Clause of the United States Constitution as well as the Mississippi Constitution.**

¶50. Starkville asserts that the Contracts Clause prohibits all retrospective legislation that violates vested contractual rights.

¶51. Before addressing the substance of this argument we must point out that Starkville's failure to notify the Attorney General of its constitutional challenge procedurally barred Starkville from raising this issue. Miss. R. Civ. P. 24(d) requires a party challenging the constitutionality of a statute to give notice to the Attorney General within such time as to afford him an opportunity to intervene and argue the question of constitutionality. The purpose of this provision is to protect the public's interest in an action which may have far-reaching implications. Miss. R. Civ. P. 24(d) states as follows:

> In any action (1) to restrain or enjoin the enforcement, operation, or execution of any statute of the State of Mississippi by restraining or enjoining the action of any officer of the State or any political subdivision thereof, or the action of

any agency, board, or commission acting under state law, in which a claim is asserted that the statute under which the action sought to be restrained or enjoined is to be taken is unconstitutional, or (2) for declaratory relief brought pursuant to Rule 57 in which a declaration or adjudication of the unconstitutionality of any statute of the State of Mississippi is among the relief requested, the party asserting the unconstitutionality of the statute shall notify the Attorney General of the State of Mississippi within such time as to afford him an opportunity to intervene and argue the question of constitutionality.

Miss. R. Civ. P. 24(d).

¶52. In *Cockrell v. Pearl River Valley Water Supply District*, 865 So. 2d 357 (Miss. 2004), we barred a motorist from arguing on appeal the issue of the unconstitutionality of a statute providing that all claims under the Mississippi Tort Claims Act were to be determined without a jury. *Id*. at 357. We declined to address the issue and held:

> "We accept without hesitation the ordinarily sound principle that this Court sits to review actions of trial courts and that we should undertake consideration of no matter which has not first been presented to and decided by the trial court. We depart from this premise only in unusual circumstances."*Educational Placement Services v. Wilson*, 487 So.2d 1316, 1320 (Miss. 1986).

> *Barnes v. Singing River Hosp. Sys.*, 733 So.2d 199, 202-03 (Miss. 1999).

865 So.2d at 360. In *Cockrell*, the motorist failed to raise the issue of the constitutionality of Miss. Code Ann. §11-46-13 before the trial court and also failed to notify the Attorney General. We ultimately concluded that Rule 24(d) barred review. Again in referring to our decision in *Barnes*, we stated that "Rule 24(d) of the Mississippi Rules of Civil Procedure requires that proper notice be given to the Attorney General when the constitutionality of a

29

statute is challenged 'to afford him an opportunity to intervene and argue the question of constitutionality.'" Miss. R. Civ. P. 24(d). *Id*. at 360.

¶53.   In the present case, Starkville did not provide notice at the trial court level to the Attorney General of its constitutional challenge to H. B. 997.   Instead, Starkville delayed notifying the Attorney General of its constitutional challenge until after all primary briefing was completed on appeal to this Court.   In fact, it was not until October 4, 2004, that Starkville filed with this Court a "Motion For Special Order" wherein it sought permission to serve a copy of its appellate brief upon the Attorney General so that the Attorney General could thereafter make an appearance in this case and file a brief with this Court.   *See* M.R.A.P. 44.   Thereafter, the Chief Justice of this Court entered an order granting Starkville's motion and permitting the Attorney General to make an appearance and file a brief.   Subsequent to this order, the Attorney General of the State of Mississippi did in fact submit a brief in this case.

¶54.   Notwithstanding this bar, this Court, in the alternative, has jurisdiction to consider constitutional challenges absent proper notice if it desires.   "Notice to the Attorney General is mandatory even if the court thinks the constitutional issue frivolous, but failure to give the notice does not deprive the court of jurisdiction to hear the case." Miss. R. Civ. P. 24 cmt. (See *State v. Watkins*, 676 So.2d 247 (Miss. 1996)).   In the case sub judice, the Attorney General has filed a brief in which he raises procedural bar due to Starkville's failure to give proper notice in the trial court; however, the Attorney General has likewise quite appropriately alternatively addressed on the merits the issue of the constitutionality of H.B. 997.

¶55. When reviewing the constitutionality of a legislative enactment, there is a strong presumption of validity, and a party challenging the constitutionality of a statute must prove the unconstitutionality of the statute beyond a reasonable doubt. *Richmond v. City of Corinth*, 816 So. 2d 373, 375 (Miss. 2002).

¶56. The Contracts Clause of the Mississippi Constitution, Miss. Const. Art. 3, § 16, is nearly identical to that of the United States Constitution, U.S. Const. Art. I, § 10, and is therefore generally construed under the same standards and analyses. *Pub. Employees' Ret. Sys. v. Porter*, 763 So. 2d 845, 849-50 (Miss. 2000). Accordingly, the United States Supreme Court's treatment of the Contracts Clause in relation to a state's police power is categorical, and the Court has refused to impair a state Legislature's ability to act for the public good.

¶57. The United States Supreme Court's treatment of the Contracts Clause as it relates to the legislature's ability to legislate for the public welfare is well-settled. Moreover, there is clear precedent supporting a state legislature's ability to obviate pre-existing contractual obligation, in order to protect the lives, health, morals, comfort and general welfare of its citizens. In *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S. Ct. 1232, 94 L.Ed.2d 472 (1987), an action brought by coal companies challenging the Pennsylvania Subsidence Act which required that fifty percent of the coal beneath certain structures be kept in place to provide surface support, the United States Supreme Court upheld legislative prerogative in the realm of public interest. *Id*. Accordingly, the Supreme Court refused to second-guess the Commonwealth's legislative determinations and held inter alia that the public

31

purposes served by the Subsidence Act justified the impairment of the coal companies'

contractual agreements with the surface-owners. *Id*. at 1253. In support of its holding, the

Supreme Court revisited Contracts Clause jurisprudence:

> [I]t is well settled that the prohibition against impairing the obligation of contracts is not to be read literally. *W.B. Wortham Co. v. Thomas*, 292 U.S. 426, 433, 54 S. Ct. 816, 818, 78 L. Ed. 1344 (1934). The context in which the Contracts Clause is found, the historical setting in which it was adopted,[8] and our cases construing the Clause, indicate that its primary focus was upon legislation that was designed to repudiate or adjust pre-existing debtor-creditor relationships that obligors were unable to satisfy. See *e.g., ibid. Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 445, 54 S. Ct 231, 78 L.Ed. 413 (1934).

480 U.S. at 502-03. In drawing its ultimate conclusion, the Supreme Court reiterated standards

for evaluating impairments of contracts:

> [T]he finding of a significant and legitimate public purpose is not, by itself, enough to justify the impairment of contractual obligations. A court must also satisfy itself that the legislature's "adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977)). But, we have repeatedly held that unless the State is itself a contracting party, courts should "properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves Group, Inc.*, 459 U.S. at 413 (quoting *United States Trust, Co.*, 431 U.S. at 23).

480 U.S. at 505.

---

[8]"The Contracts Clause was made part of the Constitution to remedy a particular social evil – the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts – and thus was intended to prohibit States from adopting 'as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.'" *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 439; 54 S.Ct. 231, 78 L.Ed. 413 (1934).

¶58.    In *Home Building & Loan Assn. v. Blaisdell*, a landmark case often referred to as the leading modern case on the Contracts Clause, the United States Supreme Court upheld Minnesota's statutory moratorium against home foreclosures, in relevant part, because the legislation at issue had the legitimate end of protecting a basic interest of society, and not just to protect the economic advantage of some favored group. *Id*. at 445.   The *Blaisdell* Court referred to its decision in *Manigualt v. Springs*, 199 U.S. 473, 26 S. Ct. 127, 50 L. Ed. 274 (1904), and stated:

> It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.

290 U.S. at 437, 54 S.Ct. at 240.   Similarly, in *Hudson County Water Co. v. McCarter*, 209 U.S. 349, 28 S. Ct. 529, 52 L. Ed. 828 (1908), the United States Supreme Court upheld a New Jersey statute which prohibited the transportation of the state's water into any other state. Speaking through Justice Holmes, the Court stated, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." 209 U.S. at 357, 28 S.Ct. at 531.

¶59.    In the case sub judice, the regulation of this State's public utilities falls squarely within our Legislature's power and authority.    It follows that the parties recognized this and even

33

contemplated it within the four corners of their contract. In passing the 1987 Amendments, the Legislature sought to centralize state authority over the regulation of our public certificated utility providers and, additionally, to extricate local interests from interfering with this authority.

¶60.    Starkville argues that its contractual rights had vested. We disagree. In *State ex rel. Pittman v. Ladner*, 512 So. 2d 1271 (Miss. 1987), this Court explained that a vested right is a right that must be a "contract right, a property right, or a right arising from a transaction in the nature of a contract which has become perfected to the degree that it is not dependent on the continued existence of the statute." *Id*. at 1275-76. Accordingly, Starkville's rights as of 1987 had yet to vest at the time its contract became subject to MPSC authority and, inasmuch as Starkville failed to secure MPSC approval, its contractual rights have yet to vest.

¶61.    Based on the foregoing reasons, we find that the chancellor did not err in finding that H. B. 997 did not violate the Contracts Clause of our federal and state constitutions.

¶62.    We thus conclude for the reasons stated that the chancellor did not err in granting summary judgment against Starkville and in favor of 4-County.

## CONCLUSION

¶63.    In 1963, Starkville and 4-County entered into an agreement which provided among other things that should Starkville thereafter annex territory serviced by 4-County, Starkville could unilaterally buy 4-County's service rights and distribution facilities within the newly annexed area, and 4-County would be obligated to sell. Starkville and 4-County, by clear and unequivocal language in their contract, mutually agreed for their contract to be subject to the

approval of the Mississippi Public Service Commission "as is or may hereafter be required by law." Based on this contractual provision, Starkville and 4-County obviously envisioned that the Mississippi Legislature would possibly enact future laws which might affect their rights and obligations created under the contract. The 1987 and 2002 Amendments are constitutional beyond any doubt and the chancellor was eminently correct in retroactively applying the 2002 Amendments (H. B. 997), to this pending litigation.

¶64. If Starkville had any hope of buying 4-County's service rights and distribution facilities in the 1994 annexed area, it had to receive MPSC approval pursuant to the 1987 and 2002 Amendments. The record is devoid of any effort on the part of Starkville to secure MPSC approval of its agreement, even after being specifically ordered by the chancellor to do so.

¶65. In sum, the chancellor did not err in (1) refusing to transfer this case to circuit court and (2) granting summary judgment by finding that (a) the 1963 Agreement was subject to approval of the MPSC pursuant to the 1987 and 2002 Amendments, (b) H. B. 997 should be applied retroactively to this pending litigation, and (c) H. B. 997 did not violate the Contracts Clause of the federal and state constitutions. While the chancellor erred in finding that Starkville lacked standing to challenge the constitutionality of H. B. 997, such error is harmless beyond any doubt since the chancellor alternatively addressed this issue.

¶66. Accordingly, we affirm the Oktibbeha County Chancery Court's entry of a final judgment of dismissal in favor of 4-County Electric Power Association and against the City of Starkville.

¶67. **AFFIRMED.**

35

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND DICKINSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**