KING, JUSTICE,
DISSENTING:
¶40. Because Section 99-19-51 does not apply to the case at hand, and because the chancery court did not err in its judgment in this case, I would affirm the judgment of the chancery court, and therefore respectfully dissent.
DISCUSSION
¶41, The Mississippi Public Records Act (MPRA) governs the extent to which information held by a public body may be accessed by members of the public. The MPRA declares the public policy of the State of Mississippi to be that:
public records shall be available for inspection by any person unless otherwise provided by this chapter; furthermore, providing access to public records is a duty of each public body and automation of public records must not erode the right of access to those records....
Miss. Code Ann. § 25-61-2 (Rev. 2010).
¶42. The MPRA defines “public records” to include:
all books, records, papers, accounts, letters, maps, photographs, films, cards, tapes, recordings or reproductions thereof, and any other documentary materials, regardless of physical form or characteristics, having been used, being in use, or prepared, possessed or retained for use in the conduct, transaction or performance of any business, transaction, work, duty or function of any public body, or required to be maintained by any public body.
Miss. Code Ann. § 25-61-3(b) (Rev. 2010).
¶43. Section 25-61-5(1) specifically provides for “public access to records”:
Except as otherwise provided by sections 25-61-9 and 25-61-11, all public records are hereby declared to be public property, and any person shall have the right to inspect, copy or mechanically reproduce or obtain a reproduction of any public record of a public body in accordance with reasonable written procedures adopted by the public body concerning cost, time, place and method of access, and public notice of the proce *942 dures shall be given by the public body, or, in the event that a public body has not adopted such written procedures, the right to inspect, copy or mechanically reproduce or obtain a reproduction of a public record of the public body shall be provided within one (1) working day after a written request for a public record is made.
Miss. Code Ann. § 25-61-5(1) (Rev. 2010).
I. Whether Senate Bill 2237 applies retroactively to the Justice Center’s records request.
¶44. The Legislature passed S.B. 2237 on May 3, 2016. It amended Mississippi Code Section 99-19-51, which delineates the method of execution used for inflicting the punishment of death. Miss. Code Ann. § 99-19-51 (Supp. 2016). It exempts from disclosure under the public records act the identities of certain entities and individuals involved in an execution.[25] “This act shall take effect and be in force from and after its passage.” S.B. 2237, § 2. We must answer the question of whether the exemption applies retroactively to a public record request made before its passage.
¶45. As an aside, the majority maintains that the sole issue before this Court is whether the 2016 amendments to Mississippi Code Section 99-19-51 have retroactive application so as to render moot the Justice Center’s public records request for documents regarding the carrying out of the death penalty by the State. Throughout this process, the issue at the heart of the matter was in fact the death penalty. The State’s brief. recognized this and couched much of this case as a public policy or political argument about the death penalty. It opened its brief with the statement that “Capital punishment implicates State interests of the highest order. Carrying out a sentence of death is the ultimate expression of the State’s authority, and the ultimate enforcement of the State’s criminal justice system.” It argued that “[i]n deciding the outcome of this appeal, it is critical that the Court consider not only the interest of the public in access to information, but the interest of the executive branch in faithfully executing all laws of. the State, including the duty to carry out the execution, of an offender .,.It maintained that “[t]his lawsuit is but one aspect of the Justice Center’s ongoing assault on capital punishment in Mississippi[,]” further stating that “[a]nti-death-penalty advocates are engaged in a well-documented ‘guerilla war’ against capital punishment, attempting to choke off the supply of drugs suitable for use in executions that are still available to the states. This Court should not permit the Justice Center to. create a de facto injunction against capital punishment by means of a backdoor attack under the Public Records Act.” The State raised the same public policy or political concerns about the death penalty in its oral presentation, opening its presentation by stating that “[i]t is important for the Court to'understand that this is not a garden-variety public records lawsuit. This particular lawsuit is part of an ongoing dispute between MacArthur Justice Center and MDOC regarding the production of [documents] related to the State’s procurement of lethal injection drugs for use in executions.” It argued that the Justice Center wants this *943 Court “to hold and believe that the Public Records Act trumps all other State interests, including the State’s interests in carrying out the. death penalty, which, is a State interest of the .highest order.” It asserted that if this Court declined to .reverse the chancery court, “it will severely impede, if not curtail, the executive branch of government’s ability to carry out death sentences ..., ” Additionally, members of this Court addressed the public policy or political issues in questions posed to the parties during argument, with many questions focusing on why the disclosure of documents would prevent or impede the State’s carrying out the death penalty.
¶46. Senate Bill 2237 happened to pass while this appeal had been pending in this Court for many months. MDOC filed a notice of appeal in this case on March 9, 2015. On April 9, 2015, MDOC requested that this Court grant a stay of the chancery court’s decision pending appeal. MDOC filed an amended notice of appeal on April 30, 2015. Briefing in this case was completed on September 1, 2015, and the case was argued on November 17, 2015. S.B. 2237 was introduced on February 5, 2016. It passed the Senate on March 1, 2016, and passed the House on March 25, 2016. The House and Senate conference reports were adopted on April 19, 2016. The enrolled bill was signed by the House and Senate on April 26, 2016. On May 3, 2016, nearly six months after this case was argued and submitted, the governor signed the bill and it became effective the same day. On May 5, 2016, less than one month shy of this Court’s statutory 270 day deadline in this case, this Court ordered additional briefing on its applicability. This Court has been dilatory in its disposition of this case. If, as the majority says, the sole issue is the application of Section 99-19-51, then that is because this Court, by the dilatory manner in which it has disposed of this case, has either wittingly or unwittingly allowed its actions to be impacted by legislative actions.
' ¶47. At the outset, th¿ plain language of the amendment indicates that it should be applied' prospectively only. The Legislature. specifically chose to note that Senate Bill 2237 would be in effect from and after its passage. This is a clear indication that the amendment applies prospectively to record requests made after the passage of the law, and not retroactively to record requests made prior to the law’s passage. Jones v. Baptist Mem’l Hosp.-Golden Triangle, Inc., 735 So.2d 993, 998 (Miss. 1999) (If the language of the bill “mandates that the statute is to apply from and after passage, it is not to be applied retroactively to causes of action which accrued prior to the passage of the statute.”).
¶48, MDOC argues that amendments to laws have the same effect as if the statute had always been in existence as amended, unless the amendment contains a savings clause. MDOC argues that when proceedings under a statute are in process and have not reached final judgment, and a new act is passed modifying the statute under which proceedings were begun, then the rule applies that the new statute governs as if it had been part of the old statute the entire time, citing City of Starkville v. 4-County Electric Power Association, 909 So.2d 1094, 1110 (Miss. 2005). Yet, City of Starkville is distinguishable from the case at hand. In City of Starkville, the Legislature passed a public utilities law in 1987, which in 2002 this Court declined to apply to a 1963 contract. City of Starkville, 909 So.2d at 1099. The Court in the 2002 decision noted that if the Legislature had wanted to invalidate existing contracts, it should have said so plainly. Id. A short time after the 2002 decision handed down, the Legislature introduced a 2002 bill specifically clarifying that the 1987 amendments applied to pre-1987 con *944 tracts. Id. at 1099-1100, 1104-06. Thus, the amendment at issue specifically and in plain language stated that it applied retroactively to contracts prior to 1987. Clearly, an amendment that was enacted solely for the purpose of stating that a statute applied retroactively is meant to be applied retroactively.
¶49. First, the legal principle argued by MDOC does not apply based on its own plain language. It is that when proceedings under a statute are in process and that statute is amended, the amendment may affect the proceedings. This case was not filed under Section 99-19-51; it was filed under the Public Records Act, Sections 25-61-1 to 25-61-19, which was not amended by the Legislature. Thus, the amendment of Section 99-19-51 clearly does not apply to this suit filed under the Public Records Act.
¶50. Even if Section 99-19-51 could be inserted into this litigation for the first time, the exception to this rule applies.
In litigation between the state and an individual, where the operative statute has been repealed or amended and the litigation arises out of a pre-repeal, pre-amendment transaction or occurrence, the individual may claim and be given the benefit of the prior law in effect at the operative time where he regards it more favorable to him. But the converse is not necessarily so. Unless the state holds a contract or otherwise has a vested right, a repealed or amended statute will ordinarily not be enforced against an individual where he regards it as less favorable to him.
Mississippi Sierra Club, Inc. v. Mississippi Dep’t of Envtl. Quality, 819 So.2d 515, 518 (Miss. 2002) (quoting State ex rel. Pittman v. Ladner, 512 So.2d 1271, 1277 (Miss. 1987)). In this case, the Justice Center claims the benefit of the prior law, and should receive it.
¶51. Moreover, the notion that an amendment may apply retroactively to ongoing litigation does not hold true when the statute modification impairs the obligation of a contract or abrogates a vested right. Stone v. Indep. Linen Serv. Co., 212 Miss. 580, 55 So.2d 165, 168 (Miss. 1951). A vested right must be “a contract right, a property right, or a right arising from a transaction in the nature of a contract which has become perfected to the degree that it is not dependent on the continued existence of the statute.” City of Belmont v. Miss. State Tax Comm’n, 860 So.2d 289, 303 (Miss. 2003) (internal quotations omitted). A contract requires “(1) two or more contracting parties, (2) consideration, (3) an agreement.that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation.” Caplin Enters., Inc. v. Arrington, 145 So.3d 608, 613 (Miss. 2014). But the right need not meet every element of a contract; it must merely occur from a transaction in the nature of a contract that has become perfected to a certain degree. The Justice Center exercised its statutory right to request documents. MDOC acquiesced to the request and demanded payment to produce the documents. The Justice Center timely paid MDOC for the records. Once payment was tendered, the Justice Center clearly perfected a right to the records.
¶52. Additionally, the Public Records Act itself creates a type of property right to public records. It states that “[e]xcept as otherwise provided by Sections 25-61-9 and 25-61-11, all public records are hereby declared to be public property.” Miss. Code Ann. § 25-61-5 (Rev. 2010). The Justice Center, as a member of the public that followed the proper statutory procedure to obtain the public records, certainly has a *945 right to those public records that have been declared public property.
¶53.1 would decline to insert Section 99-19-51 into this case for the first time and therefore decline to apply its amendment retroactively to the records request at issue. And with Section 99-19-51 being inapplicable to this case, I would affirm the judgment of the chancery court on the merits for the following reasons.
II. Whether the “Law Enforcement Exemption” protects the documents from disclosure.
¶54. MDOC argues that the chancery court failed to give adequate consideration to Section 25-61-12, which exempts from MPRA’s provisions certain private information of law enforcement agencies. Specifically, MDOC points to Section 25-61-12(2)(a), which provides that: “When in possession of a law enforcement agency, investigative reports shall be exempt from the provisions of this chapter; however, a law enforcement agency, in its discretion, may choose to make public all or any part of any investigative report.” MDOC contends that the information requested by the Justice Center falls within the scope of the term “investigative report” as defined by the Legislature in Section 25-61-3(f), and the implementation thereof by a “law enforcement agency” as defined by Section 25-61-3(g). These sections, respectively, state as follows:
“Investigative report” means records of a law enforcement agency containing information beyond the scope of the matters contained in an incident report, and generally will include, but not be limited to, the following matters if beyond the scope of the matters contained in an incident report:
(i)Records that are compiled in the process of detecting and investigating . any unlawful activity or alleged unlawful activity, the disclosure of which would harm the investigation which may include crime scene reports and demonstration evidence;
(ii) Records that would reveal the identity of informants and/or witnesses;
(iii) Records that would prematurely release information that would impede the public body’s enforcement, investigative or detection efforts;
(iv) Records that would disclose investigatory techniques and/or results of investigative techniques;
(v) Records that would deprive a person of a right to a fair trial or an impartial adjudication;
(vi) records that would endanger the life or safety of a public official or law enforcement personnel, or confidential informants or witnesses;
(vii) Records pertaining to quality control or PEER review activities; or
(viii) Records that would impede or jeopardize a prosecutor’s ability to prosecute the alleged offense.
Miss. Code Ann. § 25-61-3(f) (Rev. 2010).
¶55. “Law enforcement agency” means a public body that performs as one of its principal functions activities pertaining to the enforcement of criminal laws, the apprehension and investigation of criminal offenders, or the investigation of criminal activities.
Miss. Code Ann. § 25 — 61—3(g).
¶56. MDOC argues that subsections (e) and (f) of Section 25-61-3 describe the parameters for exempt information versus nonexempt information which must be disclosed. According to MDOC, subsection (e) defines the term of art, “incident report,” specifying the limited information that a law enforcement agency must produce upon request:
*946 “Incident report” means a narrative description, if such narrative description exists and if such narrative description does not contain investigative information, of an alleged offense, and at a minimum shall include the name and identification of each person charged with and arrested for the alleged offense, the time, date and location of the alleged offense, and the property involved, to the extent this information is known.
Miss. Code Ann. § 25-61-3(e).
¶57. MDOC acknowledges that, at first glance, the use of the term “investigative report” in Section 25-61-12 would seem to mean that documents that do not directly pertain to “investigation” of crime would not be covered. But, in defining the phrase “investigatory report” in Section 25-61-3(f), MDOC submits the Legislature created a term of art much broader than the ordinary usage of that phrase might otherwise suggest, with subparts (ii), (iii), and (vi):
(ii) Records that would reveal the identity of informants or witnesses;
(iii) Records that would prematurely release information that would impede the public body’s enforcement, investigative or detection efforts;
[[Image here]]
(vi) Records that would endanger the life or safety of a public. official or law enforcement personnel, or confidential informants or witnesses.
Miss. Code Ann. § 25 — 61—3(f) (emphasis added).
¶58. MDOC adds that the term “investigative report” includes not only documents related to the investigation, detection, and deterrence of criminal conduct, but also documents related to the enforcement of state criminal law. Further, Section 25-61-3(f) specifically protects from disclosure information that would not fall within the ordinary understanding of the term “investigative report,” including records that would deprive a person of a fair trial, records pertaining to quality control or review by the PEER committee, and records that would impede a prosecutor’s ability to prosecute an alleged offense. As an example, the term “investigative report” has been interpreted to include confidential information concerning the governor’s personal security detail pursuant to Section 25-61-3(f)(vi). See Sorrell, No. 2010-00381, 2010 WL 4105478 (Miss. A.G., Sept. 8, 2010).
¶59. MDOC maintains that it is a law enforcement agency, charged with enforcing the criminal laws of this State once matters reach the penal phase of the criminal process and offenders are committed to it by the courts. See generally Miss. Code Ann. § 47-5-10 (Rev. 2010). And it is unreasonable to think the Legislature intended to exempt from production records which, if disclosed, would hinder the investigation and prosecution of criminal offenses, but that documents which, if disclosed, would hinder the enforcement of criminal penalties deserve, no protection.
1160. MDOC recognizes that this Court, in construing the MPRA, has said “there is to be a liberal construction of the general disclosure provisions of a public records act, whereas a standard of strict construction is to be applied to the exceptions to disclosure [and] any doubt concerning disclosure should be resolved in favor of disclosure.” Miss. Dep’t of Wildlife, Fisheries and Parks v. Miss. Wildlife Enf't Officers’ Ass’n, Inc., 740 So.2d 925, 936 (Miss. 1999). MDOC argues, however, that in Wildlife, this Court construed a “narrowly drawn” exception, which the law enforcement exception is not. MDOC contends the phrase “will include, but not be limited to” found *947 in Section 25 — 61—3(f), describes a broad exemption, not a narrow one.
¶61. MDOC argues that disclosing the identity of the drug suppliers would impede MDOC’s efforts to obtain and maintain an adequate supply of the necessary drugs required to carry out the lethal-injection process. MDOC contends that inadvertent disclosure of information which allowed one such supplier to be identified last year directly impeded MDOC’s efforts to renew the State’s supply of pentobarbi-tal. When MDOC responded to the February 7, 2014, request for lethal injection documents from the Justice Center, MDOC attempted to redact all information which would identify the drug supplier(s) before producing those documents. But the documents had not been redacted sufficiently, and information such as the date and amount of the transactions inadvertently was disclosed. The Justice Center was able to take that information and identify the supplier by comparison with information available on the State’s transparency website. The Justice Center thereafter disclosed the identity of the supplier in court documents and statements to the press. See Tracy Connor, Mississippi Death Row Inmate Michelle Byrom Challenges Drugs, NBC News (Mar. 28, 2014), available at http://www.nbcnews.com/ storyline/lethal-injection/mississippi-death-row-inmate-michelle-byrom-challenges-drugs-n66301 (last visited April 11, 2017). The Justice Center then filed a federal Section 1983 complaint in state court on behalf of two death-row inmates, challenging the constitutionality of Mississippi’s lethal-injection protocol, and by virtue of subpoenas to the Mississippi supplier and to the company that sold the pentobarbital to the Mississippi pharmacy for resale, obtained all records in the possession of those entities directly.[26]
¶62. According to MDOC, since the disclosure of the identity of that supplier, MDOC has been unable to obtain a new supply of pentobarbital from any source, requiring that the State amend its lethal injection protocol to permit substitution of “other similar drugs” for sodium pentothal and/or pentobarbital before MDOC will be capable of carrying out any executions. MDOC points out that Commissioner Marshall Fisher recently informed Judge Win-gate of that point in a pending Section 1983 action brought by the Justice Center on behalf of convicted capital murderers Richard Jordan and Ricky Chase. See Jordan v. Fisher, No. 3:15-cv-00295 (S.D. Miss. Jul. 20, 2015).[27]
*948 ¶63. MDOC argues that the crucial drug in the three-drug lethal-injection protocol has been and remains the first drug, the purpose of which is to render the inmate insensate before the second and third drugs are administered. Baze v. Rees, 553 U.S. 35, 53-54, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Without the crucial first drug, a three-drug protocol execution cannot be carried out in a humane fashion. Id. Thus, according to MDOC, to date, death penalty-opponents have concentrated their efforts on making appropriate anesthetics unavailable for use in executions, primarily by convincing the manufacturers to prohibit distribution to the states for use in executions.
¶64. MDOC says the second and third drugs were still available to MDOC in 2014. But without the crucial first drug, MDOC cannot carry out an execution in compliance with Mississippi Code Section 99-19-51, which requires the use of “an ultra short acting barbiturate or other similar drug.” See Miss. Code Ann. § 99-19-51 (Rev. 2015). MDOC claims it does not have all the drugs necessary to cany out an execution lawfully, has been unable to obtain all necessary drugs, and does not anticipate obtaining drugs permitting an execution using the current three-drug protocol. MDOC claims that, since the last supplier of pentobarbital to the State was publicly “outed” by the Justice Center last year, MDOC has been unable to obtain a new supply of pentobarbital from any source.
¶65. I do agree that, in general, MDOC constitutes a law enforcement agency whose primary function is to enforce the penalty phase of the criminal process, which includes carrying out lawful executions for the state. I also note that death penalty opposition groups have instituted a campaign against drug manufacturers and suppliers — pressuring them not to supply lethal injection drugs to the states. Glossip v. Gross, — U.S. -, 135 S.Ct. 2726, 2733, 192 L.Ed.2d 761 (2015). The success of this campaign has, no doubt, impeded MDOC’s ability to carry out lawful executions for the State of Mississippi under the manner prescribed by Section 99-19-51. And to this end, MDOC makes a valid argument that, without the exemptions provided under the MPRA, it will be unable to carry out its statutorily prescribed function. But this is a controversy for the Legislature.[28] As the chancery court found, the records sought by the Justice Center in this case do not fall under any of the exemption provisions prescribed by MPRA.
¶66. I would reiterate that “[t]he intent of the Legislature is manifestly clear from [the MPRA] provisions: public records which do not fall into a carefully defined exception provided by law are entirely open to access by the general public.” Miss. Dep’t of Wildlife, 740 So.2d at 936. The records sought by the Justice Center do not constitute investigative reports, as contemplated by Section 25-61-12(2)(a), and defined by Section 25-61-3(f).
¶67. In defining the phrase “investigative report” in Section 25 — 61—3(f), the Legislature has not created a term of art much broader — as MDOC contends — than the ordinary usage of that phrase might otherwise suggest. As the Justice Center correctly points out, Section 25-61-3(e) defines “incident report” as a “narrative description of an alleged offense” — so long as it does not contain “investigative informa *949 tion.” Subsection (3)(e) goes on to list the types of basic information expected to be found in an incident report: the name of the arrestee, the time, date, and location of the alleged offense, and the property involved in the alleged offense. Miss. Code Ann. § 25 — 61—3(e) (Rev. 2010). Subsection (3)(f) is meant to be read in conjunction with subsection (3)(e). Subsection (3)(f) distinguishes the more detailed “investigative report,” which contains matters that are beyond the simple information found in an incident report, and gives an illustrative list of this type of information. While MDOC is correct that the list is nonex-haustive, it is nonetheless limited to the scope of subsection (3)(f). Subsection (3)(f) chiefly contemplates the investigatory stage(s) of criminal matters, and it allows law enforcement agencies to determine what is public record and what is not at this stage of the criminal process, so as not to jeopardize the investigation and/or endanger those affiliated.
¶68. I believe that accepting MDOC’s arguments on this issue would result in carving out an exception to the MPRA which the Legislature has not provided. Accordingly, this issue is without merit.
III. The identity of MDOC’s drug supplier(s) is confidential commercial information exempt from disclosure under the Public Records Act.
¶69. Section 26-61-9 contains the following provisions: ... “[rjecords furnished to public bodies by third parties which contain trade secrets or confidential commercial or financial information shall not be subject to inspection, examination, copying or reproduction under this chapter until notice to said third parties has been given, but such records shall be released within a reasonable period of time unless the said third parties shall have obtained a court order protecting such records as confidential.” Miss. Code Ann. § 25-61-9(1) (Rev. 2010).
¶70. Quoting from Caldwell & Gregory, Inc. v. University of Southern Mississippi, 716 So.2d 1120, 1122 (Miss. Ct. App. 1998), MDOC argues that by its terms, this statutory exemption “protects a broader range of information than just that covered under the ... definition” of a trade secret in “the Trade Secret Act.” MDOC contends that, as the Caldwell court held, Section 25-61-9(1) exempts from disclosure any documents provided to state agencies by private third parties that contain “information regarding their financial status and business practices that they would legitimately consider confidential even though the information might not meet the strict test of being a trade secret as that term is defined in the Trade Secrets Act or previous judicial opinions.” Caldwell, 716 So.2d at 1122. Therefore, according to MDOC, the MPRA does not merely shield information that gives a business a competitive advantage over others by virtue of being secret; it shields any information that was furnished to a state agency with a reasonable expectation that it would remain confidential.
¶71. The chancery court rejected MDOC’s argument, holding as follows:
And in this case there is no evidence that shows any information requested by the Justice Center contains any confidential or privileged information. There is no evidence that the information requested contains a third party’s trade secrets. And there is no evidence that shows any confidential financial information is at stake of being revealed.
¶72. I agree with the chancery court. According to the chancery court, the “fear” that releasing the name(s) of MDOC’s drug supplier(s) would potentially result in “threats” and “harm” to the supplier(s) *950 was insufficient to render this information confidential within the meaning of the statute. The chancery court concluded that entities which sell lethal-injection drugs to the State assume the inherent risk of operating under the specter of harassment and harm simply by providing the State with the means to carry out executions. The chancery court stated, “It is the nature of the beast for executions to rile up fear in individuals who take part.in the process leading to or during an execution.”
¶73. MDOC contends that the chancery court erred as a matter of íaw in holding that Section 25-61-9(1) does not exempt information regarding a third party’s lawful commercial transactions with a state agency when it reasonably fears public disclosure of that information will adversely affect its financial interests. MDOC argues that, under the unique circumstances at issue in this case, and given the singular nature of the information sought to be protected, this Court should conclude that any entity which provides lethal-injection drugs to MDOC legitimately considers its identity to be confidential and reasonably fears that disclosure of its identity would place it in danger and likely subject it to harassment, reprisal, and/or economic harm. As such, any information that would allow the Justice Center to publicly identify MDOC’s drug supplier(s) should have been deemed “confidential commercial information” exempt from disclosure under Section 25-61-9(1).
¶74. Caldwell is inapplicable. There, the chancery court had ordered the University of Southern Mississippi to deliver to a competitor of Caldwell & Gregory a copy of a bid proposal submitted to the University by Caldwell & Gregory, for the operation of the coin-operated laundry facilities found in various residence halls on the campus. Caldwell, 716 So.2d at 1120. Caldwell & Gregory, desiring to maintain the confidentiality of-its proposal, appealed, claiming the chancery court had erred in finding that the proposal was not exempt from disclosure, as an exception to the MPRA. Id. at 1120-21. The Court of Appeals reversed the judgment, finding that the court had applied an incorrect legal standard in ordering disclosure. Id. at 1121. ■
¶75. Here, however, no third party, as contemplated by the plain language of Section 25-61-9(1), is a part of this action. Section 25-61-9(1) clearly requires a third party to obtain “a court order protecting such" records as confidential.” That is not the case here.
¶76. MDOC is the entity claiming exemption under the Section 25-61-9(1), not any third-party drug-manufacturer or supplier. Accordingly, this issue is without merit.
IV. The Courts have inherent and statutory authority to protect the identity of lethal-injection drug-suppliers.
¶77. MDOC argues that the chancery court committed reversible error by refusing to declare the redacted information confidential or exempt pursuant to Section 25-61-11. This section states as follows:
The provisions of this chapter shall not be constituted to conflict with, amend, repeal or supersede any constitution or statutory law or decision of a court of this state or the United States which at the time of this chapter is effective or thereafter specifically declares a public record to be confidential or privileged, or provides that á public record shall be exempt from the provisions of this chapter.
Miss. Code Ann. § 25-61-11 (Rev, 2010).
¶78. Citing Estate of Cole v. Ferrell, 163 So.3d 921 (Miss. 2012), MDOC argues that *951 this Court has expressly recognized the courts’ authority to declare public records confidential or exempt pursuant to Section 26-61-11. Ferrell stated:
[T]he [MPRA] does not conflict with the court’s authority to declare a public record confidential or privileged.... A court may, within its discretion, determine if nonexempt matters should be declared confidential or privileged, removing those documents from public disclosure.
Ferrell, 163 So.3d at 925. In conclusion, Ferrell held that, “[t]he law allows courts to determine when information should be declared confidential or privileged, exempting it from the Public Records Act.” Id. at 929. In determining whether records should be confidential or exempt, a court must “balance[e] the parties’ competing interests — the public’s right of access versus confidentiality.” Id. at 924.
¶79. MDOC claims the chancery court did not perform the balancing test described in Ferrell According to MDOC, the chancery court considered only the general interest of the public in access to information, while ignoring strong countervailing state interests. MDOC contends the court did not balance the public’s interest in access against the State’s interest in having the means to carry out the execution of the death sentence. And the court failed to acknowledge that the impact that disclosure would have on third-party supplier(s) and their willingness to supply additional lethal-injection drugs to MDOC was a legitimate concern. Thus, the court’s failure to acknowledge, or even give any weight to, these important State interests was an abuse of discretion, so MDOC argues.
¶80. MDOC is incorrect that Section 25-61-11 gives courts carte blanche to declare any document whatsoever confidential. Ferrell is distinguishable because the document at issue was a judicial record, and courts have long had the authority to seal judicial records. Ferrell does not stand for the proposition that courts, out of whole cloth, can create exemptions or declare any document whatsoever confidential. The chancery court did not err by failing to create a new exemption to the Public Records Act. This issue is without merit.
Y. The chancery court awarded an excessive amount of attorneys’ fees to the Justice Center.
¶81. The Justice Center filed a motion for statutory penalties, attorneys’ fees, and expenses, seeking a total award of $13,423.12, which the chancery court granted.
¶82. MDOC argues that, even if the chancery court did not err in concluding that MDOC had violated the MPRA, the court abused its discretion by simply accepting the gross amount requested by the Justice Center without making the searching inquiry required by this Court’s decisions. MDOC essentially contends that the attorneys’ fees were excessive because two attorneys worked on the case and some of the time expended by the two was unnecessarily duplicative.[29] Quoting McKee v. McKee, 418 So.2d 764 (Miss. 1982), MDOC contends that “[i]n determining an appropriate amount of attorneys fees, a sum sufficient to secure one competent attorney is the criterion by which we are directed.” Id. (citing Rees v. Rees, 188 Miss. 256, 194 So. 750 (1940)).
*952 ¶83. The chancery court did not abuse its discretion in the total amount it awarded to the Justice Center. The chancellor was provided with an itemized account of all of the Justice Center’s attorney’s fees and charges. James Craig, attorney for the Justice Center, submitted a detailed affidavit to the chancery court the time record for himself and co-counsel, Emily Washington. Reviewing this evidence, I find that it supports the chancery court’s award. Craig charged a rate of $170 per hour, and Washington charged $100 per hour. Both rates were reasonable, as was the total amount of time expended on the case by both counsel. Nothing in this evidence affirmatively shows that some of the time expended by the two was unnecessarily duplicative. Based on our review of the time records, had Craig not used Washington’s services, the total amount of attorney’s fees would have been higher, based on Craig’s hourly rate. Accordingly, this issue is without merit.
CONCLUSION
¶84. Section 99-19-61 does not apply to this case. I would therefore affirm the Hinds County Chancery Court’s order granting the Justice Center’s complaint for declaratory judgment requesting that actions and omissions taken by MDOC be deemed in violation of MPRA and that MDOC be required to produce public records sought by the Justice Center. I would also affirm the chancery court’s award of statutory penalties, attorneys’ fees, and expenses.
KITCHENS, J., JOINS THIS OPINION.

. The majority claims that a retroactivity analysis' is not applicable because this law •applies to disclosures and not to requests, - This is a distinction without a difference. The obligation to disclose documents occurs upon submission of a valid request, and no obligation to disclose exists without such a request. Thus, we should examine the disclosure that MDOC was required to make at the time the request was made (and, at the time the disclosure was actually required),

. See Michelle Byrom and Charles Ray Crawford v. Christopher Epps, et. al., Chancery Court of the First Judicial District of Hinds County, Mississippi, No, G2014-420.

. According to MDOC, in that lawsuit, the plaintiffs allege that the states of Missouri, Texas, and Georgia have been able to replenish their supplies of pentobarbital, such that those drugs are "available” to MDOC. See Richard Jordan, et al. v Marshall L. Fisher, et al., No. 3:15-cv-00295 (S.D. Miss. Jul. 20, 2015) (Plaintiff’s Memorandum in Opposition to Defendant’s Motion to Dismiss), According to MDOC, it cannot obtain drugs from suppliers it cannot identify or locate. Missouri, Texas, and Georgia are not sharing the identities of their supplier(s) with anyone'. Those states have been able to replenish their drug supplies only by keeping the identity of their suppliers) strictly confidential, MDOC con- . tends that if capital-punishment opponents like the Justice Center identify any of those suppliers, legal action will be taken to eliminate those' suppliers as sources of lethal injection drugs, just as opponents were able to do with regard to the Woodland Pharmacy in Texas and The Apothecary Shoppe in Oklahoma (which allegedly was Missouri's previous supplier), According to MDOC, since Nembutal, the only FDA-approved injectable form of pentobarbital, is unavailable for use in executions, the Justice Center is- fully aware that any pentobarbital legally obtained by those States was compounded pentobarbital, *948 the use of which the Justice Center alleges is unconstitutional.

. The Legislature appears to have resolved this controversy going forward. However, it had not resolved it as of the time of the Justice Center's record request.

. While MDOC complains that two attorneys worked on this case for the Justice Center, the State has multiple attorneys representing it in this matter. Indeed, at the chancery court hearing, three attorneys for the State made appearances, while only one made an appearance for the Justice Center.